**Reversed, Rendered, Remanded, and Memorandum Opinion filed November 20, 2014.**



In the

# Fourteenth Court of Appeals

---

## NO. 14-13-00990-CV

---

**ANTHONY M. WOOD D/B/A THE PEOPLE'S AIR CONDITIONING & HEATING COMPANY, Appellant**

**V.**

**PYRAMID COMMUNITY DEVELOPMENT CORPORATION, Appellee**

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 2009-60612**

---

## M E M O R A N D U M   O P I N I O N

This appeal concerns an alleged breach of contract related to nonpayment for materials and services provided to appellee Pyramid Community Development Corporation by appellant Anthony M. Wood d/b/a The People's Air Conditioning & Heating Company. The jury rendered findings favorable to Wood regarding Wood's provision of certain materials and services, the existence of an agreement

to pay for those materials and services on an installment basis, Pyramid's failure to pay installments, damages, and attorney's fees. The trial court granted Pyramid's motion for judgment non obstante veredicto.

We conclude that the trial court erred, reverse the JNOV, and render judgment reinstating the jury's verdict for damages in the amount of $202,000.00 and attorney's fees in the amount of $16,178.75. We remand to the trial court below for the limited purpose of calculating and awarding pre- and post-judgment interest as allowed by law.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Anthony M. Wood owned an air conditioning repair company known as The People's Air Conditioning & Heating Company. Appellee Pyramid Community Development Corporation owns and operates the Power Center—a large business complex that contains a conference facility, a bank, a doctor's office, a pharmacy, and a school—and a WIC facility. These two buildings total 104,000 square feet.

Starting in 2002, Wood began performing air conditioning services for Pyramid. Wood received work from Pyramid's director of operations, Donnell Cooper. Wood submitted invoices for his work, and Pyramid typically paid Wood's invoices on a 30-day basis. According to what Cooper told Wood, Pyramid's board had to review invoices over $50,000.

In 2004, Wood submitted invoices on three particular jobs for Pyramid, all requested and approved by Cooper:

- Invoice 1142, dated August 30, 2004: to address a kitchen unit that was not cooling, Wood "[r]eplace[d] UPC circuit board," "[c]harge[d] unit to level of cooling," and "[c]heck[ed] circuit wiring" for a total of $750.00.

2

- Invoices 1160 and 1161, dated September 14, 2004:
  - With regard to Invoice 1160, Wood replaced "[t]wo semi hermetic comp[ressors]," "[t]wo 7.5 ton compressors," and provided five hours of "[c]rane service" and four "[l]aborers" for a total of $26,730.80.
  - With regard to Invoice 1161, Wood provided 90 pounds of "R-22 Freon" at $18.00 per pound to recharge the compressors for a total of $1620.00.
- Invoice 1154, dated October 7, 2004: to address compressor warranty issues, Wood installed return air systems for the Power Center building and the separate WIC building; three units—in the administrative wing, the Power Suites, and the school office; and a fan motor for the kitchen unit, using "12 crews" over three days, for a total in parts and labor of $173,300.00.

As of October 8, 2004, Pyramid owed Wood $202,400.00 on these four invoices. Wood and Cooper discussed payment—Cooper indicated that the board might authorize monthly payments of $25,000 or $50,000. Wood stated he "had no problem with that," particularly as Cooper had informed him that Pyramid was planning new developments and Wood understood he could be "in the No. 1 position" to receive some, even all, of that work.

Wood testified that a few weeks later, on a Friday evening at about 10:30 p.m., Cooper called him at home and requested that he come to the Power Center because "everything is just falling apart" from the "real bad rain." Wood arrived to inspect the premises and found that much of the Power Center ceiling and lighting, and "all the return air duct that [Wood] had put up for the warranty, all that duct work" for 17 units, had caved in. Wood explained that the combination of the rain and leaving all the units running had caused condensing water to "back up" into the drain pans.

3

Wood agreed he would get the Power Center building back to "operational" if Cooper signed a proposal for the job. This proposal was dated October 25, 2004 (the "October 25 proposal"). In exchange for the sum of $220,000.00, Wood would correct the return air duct system on 17 units, with each unit supplying and returning air to a designated space, and each unit to have a "24 by 24 filter grill for return air directly to the space roof top unit"; install drain lines for 28 roof top units; and remove existing return air ducting and drain lines. Cooper signed the October 25 proposal, and Wood completed the job, utilizing "17 crews," including electricians, "sheetrock people," and "cleaning people," over the weekend so the building could be open for business on Monday. As of completion of this job, Pyramid owed Wood a total of $422,400.80.

After this job was completed, Cooper was suspended from his position and Wood started working with Deborah Anderson, the executive director of Pyramid, on the payment arrangements. On November 16, 2004, Anderson sent Wood a letter enclosing a check for $850.00, to be credited toward "a balance due [Wood] of $172,450 for the installation of various air conditioning components."[1] In the November letter, Anderson expressed Pyramid's regret that Wood was under the impression that Cooper had authority to approve the work completed without authorization by the board but that Pyramid intended to "pay [Wood] for the services rendered" in installments of $8,158.15 monthly over 24 months commencing December 1, 2004 at 12.5% yearly interest.[2]

Also in November 2004, Pyramid via Anderson submitted a notice of loss to its insurance carrier. The notice reported that the date of loss was October 25, 2004, and the location of loss was the "facility air return system." The notice

---

[1] Adding $850.00 to $172,450.00 equals $173,300.00.

[2] The first check for the amount of $8,158.15 was actually dated November 16, 2004.

4

reported that the probable amount of entire loss was $220,000.00. The October 25 proposal was attached to the claim as the description of loss and damage. With regard to the kind of loss, the notice referred to an attached statement by Wood regarding the October 25 heavy rain, the inability of the units to drain properly, the resulting damage and collapse of the Power Center roof, installation of all new drainage systems, and removal of damaged return air systems and installation of new return air systems for 17 units. The proceeds from this claim were to be paid to Wood. The carrier ultimately completed its investigation and concluded that Pyramid's policy did not cover the October 25 occurrence. The carrier informed Pyramid of the lack of coverage initially by letter dated January 5, 2005. After reopening its investigation, the carrier again concluded and informed Pyramid by letter dated April 19, 2005, that Pyramid's policy did not cover the October 25 occurrence.

In early January 2005, Wood received an additional job from Anderson. This job involved removal of four units from the Village of Hope facility and installation of those units at the Power Center, for a total of $18,000.00.

On April 14, 2005, Anderson sent Wood a letter enclosing a check for $50,000.00, to be credited "toward the balance owed for the installation of the return air system, transfer of units from Village of Hope, and installation of several other units," which reportedly was $121,701.10, after this remittance. Anderson stated that Pyramid would continue to remit $8,158.15 monthly "until the balance is paid in full." Anderson also stated that Pyramid would pay $1,500.00 biweekly for the services rendered to transfer and install the Village of Hope units.

On July 15, 2005, Anderson sent Wood's attorney a letter describing a "payoff agreement" for the "installation of: (1) return air system on 2 buildings, (2) 3 air conditioning units, and (3) roof top drains for air conditioning and heating on

5

2 buildings," which reported balance was $103,884.80. Pyramid indicated it would pay three monthly payments of $25,000.00 on the 16th of each month, beginning in July 2005, and a final payment of $28,884.80, with all interest waived. According to Wood, this "payoff" plan did not cover his full balance but primarily the $173,300.00 "warranty" job, Invoice 1154. Anderson sent another $25,000 with a letter dated August 12, 2005, reporting the current balance at $78,884.80.[3] On October 13, 2005, Anderson sent Wood's attorney a letter enclosing a check for $28,884.80, representing "the final payment of expenses associated with the installation of the return air system and other miscellaneous HVAC services at the Power Center."

At this point, Pyramid had paid Wood a total of $238,000.00. The total amount of air conditioning services rendered by and for which Wood testified he expected payment was $440,400.80, which covered what Wood referred to as:

- Phase 1—Invoices 1142 ($750.00), 1154 ($173,300.00), 1160 ($26,730.80), and 1161 ($1,620.00) (totaling $202,400.80);

- Phase 2—the October 25 proposal submitted as an insurance claim but ultimately not covered ($220,000.00); and

- Phase 3—the January 2005 Village of Hope project ($18,000.00).

According to Wood, this left a balance of $202,400.80. When he received no additional checks after October 2005, Wood approached Anderson and informed her that Pyramid owed him more money. Pyramid submitted no further payments to Wood because, according to Anderson, the October 25 proposal did not amount to any additional work beyond the work reflected in Invoices 1142, 1154, 1160, and 1161. However, Anderson acknowledged that if Wood did in fact complete

---

[3] Although the record contains a check dated September 13, 2005, in the amount of $25,000, the record does not contain a September 2005 letter.

the work described in the October 25 proposal, then he should be paid. Anderson also acknowledged that Pyramid paid Wood approximately $18,000 more than the amounts payable for Invoices 1142, 1154, 1160, and 1161, and for the Village of Hope project.

Wood filed suit on September 21, 2009, less than four years after Pyramid's final payment in October 2005. In his live petition, Wood asserted causes of action for breach of contract, suit on sworn account, quantum meruit, and breach of guaranty. Pyramid moved for, and the trial court granted, summary judgment on the basis of limitations. In a prior appeal, this court reversed and remanded, concluding there were fact issues on the contract claim and that Pyramid was not entitled to summary judgment on its limitations defense. *Wood v. Pyramid Cmty. Dev. Corp.*, No. 14-11-00428-CV, 2012 WL 2394053, at \*4–5 (Tex. App.— Houston [14th Dist.] June 26, 2012, no pet.) (mem. op.).

After a trial on the contract claim, a jury found the following:

- Wood provided Pyramid with all or part of the materials and services in the October 25 proposal.
- Wood and Pyramid agreed that Pyramid would pay Wood for the materials and services in the October 25 proposal in installments that would be due on or after September 22, 2005.[4]
- Pyramid failed to pay installments which were due to Wood on or after September 22, 2005.
- The total amount of unpaid installments due on or after September 22, 2005 was $202,000.00.
- A reasonable fee for the necessary services of Wood's attorney

---

[4] Pyramid moved for directed verdict on its affirmative defense of statute of limitations, arguing that the accrual date for Wood's contract claim was October 27, 2004, and thus his claim fell beyond the four-year limitations period. The trial court partially overruled and partially granted Pyramid's motion and incorporated the September 22, 2005, date—four years prior to Wood's filing his original petition—into questions 2 through 4.

in the case was $16,178.75.

Wood filed a motion to enter judgment, and Pyramid filed a motion for JNOV. Pyramid argued that there was no evidence to support: (1) the $220,000.00 due under the October 25 proposal was included in an installment contract and (2) Pyramid missed fixed payments due under an installment contract beyond September 22, 2005. The trial court granted Pyramid's motion for JNOV, and Wood timely appealed.

## II.    STANDARD OF REVIEW

Judgment against a jury verdict is proper only when the law does not permit reasonable jurors to decide otherwise. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We therefore review JNOVs for legal sufficiency of the evidence supporting the verdict, bearing in mind that it is the jury's sole province to evaluate witness credibility and determine the weight to attach to testimony. *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 626 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing *Wilson*, 168 S.W.3d at 819). To sustain a no-evidence challenge, we must find: (1) there is a complete absence of evidence of a vital fact, (2) the law or rules of evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) there is no more than a scintilla of evidence offered to prove a vital fact, or (4) the evidence conclusively establishes the opposite of the vital fact. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004).

We consider the evidence at trial in the light most favorable to the verdict and indulge every reasonable inference that would support the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See Wilson*, 168 S.W.3d at 823, 827. If the evidence viewed in this light would enable reasonable

8

and fair-minded people to find the challenged fact, then JNOV is improper. *See id.* "We will uphold the jury's finding if more than a scintilla of competent evidence supports it"—that is, if the evidence falls within the zone of reasonable disagreement. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Wilson*, 168 S.W.3d at 822.

In reviewing factual sufficiency, we must consider and weigh all the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.* at 761. We may not substitute our own judgment for that of the factfinder, even if we would reach a different answer on the evidence. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). The amount of evidence necessary to affirm the factfinder's judgment is far less than that necessary to reverse its judgment. *Id.*

When an appellate court determines the trial court erroneously rendered a JNOV, the appellate court must reverse the trial court's judgment and enter judgment in harmony with the verdict, unless the appellee by cross-point argues a legal reason to affirm the judgment or that the factual insufficiency of the evidence merits a new trial. *See* Tex. R. Civ. P. 324(c); *Burns v. Resolution Trust Corp.*, 880 S.W.2d 149, 151 (Tex. App.—Houston [14th Dist.] 1994, no writ).

### III.    ANALYSIS

In a single issue on appeal, Wood contends that the trial court erred in signing its order granting Pyramid JNOV because there was sufficient evidence to support the jury's findings in his favor. By cross-point, Pyramid asserts that there is insufficient evidence to support the jury's verdict and that the statute of

limitations vitiates the jury's verdict.

## A. The evidence is legally sufficient to support that the parties modified the payment terms of the October 25 proposal.

In its JNOV motion, Pyramid argued there was no modification to the October 25 proposal's payment terms, essentially asserting that the jury reasonably could not have answered question 2 in Wood's favor. Question 2 asked, "Did [Wood] and [Pyramid] agree that [Pyramid] would pay [Wood] for the materials and services referred to in [the October 25 proposal] in installments that would be due on or after September 22, 2005?" On appeal, Wood contends that although Pyramid denies the existence of any additional debt related to the October 25 proposal, the record supports the parties agreed to modify how Wood was to be paid, and despite disagreement over the terms of that installment agreement, the jury reasonably resolved disputes in Wood's favor.

Wood agreed to perform extensive emergency repairs to the Power Center only if Cooper agreed to sign a proposal. The October 25 proposal states that payment of the $220,000.00 was to be made "50% down $110,000.00 and balance upon completion of work." Pyramid did not make such down payment, but according to Wood, he moved forward with the repairs to return the Power Center to operational over the weekend, had completed the repairs by that next Monday, and expected to be paid for such work. The record does not indicate that Pyramid paid any balance upon such completion. At the time Wood had completed the repairs reflected in the October 25 proposal, Pyramid also had not paid Wood anything toward four invoices reflecting previous services provided in the total amount of $202,400.80. Around this time, Cooper indicated to Wood that the board could authorize monthly payments of $25,000 or $50,000, and Wood had "no problem" with that. Then Pyramid suspended Cooper and Wood began

10

"dealing" with Anderson.

The entire October 25 proposal was submitted to Pyramid's insurance carrier as a $220,000.00 claim as of November 9, 2004. Wood assisted with the insurance carrier's investigation of the claim and expected any insurance proceeds to be paid to him toward the October 25 proposal. The carrier initially denied the claim in January 2005, and finally denied it as of April 19, 2005.

With regard to payments, Pyramid provided Wood a check dated October 28, 2004, for $850.00. By letter dated November 16, 2004, Pyramid informed Wood that it intended to pay him 24 payments of $8,158.15 on a balance of $172,450.00, which included 12.5% annual interest. In addition, by check dated April 14, 2005, Pyramid paid Wood $50,000.00, and by letter dated that same day, noted a balance of $121,701.10 and referenced the monthly $8,158.15 payments payable "until the balance is paid in full." Pyramid paid Wood eight monthly checks in the amount of $8,158.15, with the last one dated June 8, 2005. In the same letter, Pyramid informed Wood that the payment plan for the Village of Hope job was "$1,500 every other week" until April 29. Pyramid paid Wood eight biweekly checks in the amount of $1,500.00, with the first one dated January 19, 2005, and the last one dated April 27, 2005. The record also reflects a check dated January 19, 2005, to Wood in the amount of $6,000.00.

By letter dated July 15, 2005, Pyramid stated that a payoff agreement had been reached with regard to paying off a balance of $103,884.80 for installation of the return air system on two buildings, three air conditioning units, and roof top drains on two buildings. This arrangement waived interest. Pyramid paid Wood three monthly checks dated July 12, August 10, and September 13, 2005, each in the amount of $25,000.00, and one monthly check dated October 11, 2005, in the amount of $28,884.80, tracking Pyramid's July 2005 letter. The total of all the

11

checks Pyramid paid Wood is $238,000.00. After Wood did not receive another check payment in November 2005, he approached Pyramid to demand the rest of the money owed to him, or $202,400.80.

The jury found that Wood and Pyramid agreed that Pyramid would pay Wood for the materials and services in the October 25 proposal in installments due on or after September 22, 2005. The record contains evidence that Wood provided air conditioning-related materials and services to Pyramid totaling $440,400.80 and expected to be paid for that entire amount. Pyramid requested and accepted all the work, and communicated its desire to pay Wood for all of his "services rendered." However, instead of paying any of his invoices within 30 days or paying the October 25 proposal according to its terms, Pyramid submitted 23 checks to Wood in furtherance of an installment payment plan—albeit one containing various terms regarding the amounts and scheduling of payments, application of interest, and the subject work at issue—as modified over time.

Pyramid does not dispute that Wood completed the invoice work or the Village of Hope project. The October 25 proposal related to materials and services to repair the "collapse" of the return air ducting in the Power Center, which Wood testified he had previously replaced (on both the Power Center and the WIC facility) due to warranty concerns per Invoice 1154. Pyramid submitted the entirety of the October 25 proposal as an insurance claim, suggesting that Pyramid viewed all the work described in it as a legitimate business loss. Moreover, the jury found that Wood provided Pyramid with all or part of the materials and services from the October 25 proposal.[5] Further, Anderson acknowledged that if

---

[5] Despite its running theme at trial that Wood did not perform any additional work in the October 25 proposal beyond what was included in the Phase 1 invoices, in its JNOV motion Pyramid did not specifically challenge the jury's finding of "yes" in question 1 that Wood provided Pyramid with materials and services from the October 25 proposal.

12

Wood in fact performed all the work outlined in the October 25 proposal, he would be entitled to payment for the entire $220,000.00. At least three letters, all dated after the carrier had denied Pyramid's insurance claim, referenced installment payments going toward materials and services included within the October 25 proposal, i.e., the roof top drains.[6] As of the last payment Pyramid provided in October 2005, Pyramid had paid Wood $238,000.00. Anderson acknowledged that this amount included about $18,000 more in payment than reflected in the four invoices and the Village of Hope project.

Pyramid focuses almost exclusively on the weight of certain trial testimony by Wood wherein he indicated he did not "for the services provided on October 25th, 2004, enter into an installment payment plan to allow for that matter to be paid out over a period of time." However, keeping in mind we must indulge every reasonable inference to support the challenged finding, a reasonable and fair-minded jury may have interpreted the defense's question and Wood's answer to mean that the installment arrangement reached all the "Phases" of the work Wood had performed—not merely the "matter" of the October 25 proposal. Moreover, in the specific context of discussing the $220,000 insurance claim, Anderson acknowledged that "a conversation ensued with Mr. Wood regarding, of course, a payment plan so we could actually pay" because as a nonprofit Pyramid could not pay such a "lump sum." The jury was free to choose Wood's version of events over Pyramid's, and to believe or disbelieve certain testimony in whole or in part, to determine that the "payment plan" included the October 25 proposal. *See Ulogo v. Villanueva*, 177 S.W.3d 496, 499 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (op. on reh'g) (citing *Miller v. Kendall*, 804 S.W.2d 933, 939 (Tex. App.— Houston [1st Dist.] 1990, no writ)).

---

[6] The only time installation of roof top drains is mentioned is in the October 25 proposal.

Pyramid also notes that Wood identified two installment letters (dated in April and July 2005) as referencing payments toward Phase 1. Although Pyramid's installment payments up until October 11, 2005, may have reflected payment mainly toward Phase 1 (the four invoices) and Phase 3 (the Village of Hope project)—and although Pyramid disputed that Wood reinstalled certain return air duct work for the Power Center in Phase 2 (the October 25 proposal)—there is evidence that Pyramid agreed to pay and had begun paying Wood for his work on the October 25 proposal by installment.[7] Specifically, the last four installment checks Pyramid provided Wood included payment going toward the October 25 proposal.

Based on our review of the evidence in the light most favorable to this finding, we conclude the evidence at least raised a fact issue as to the existence of an installment contract covering the work Wood performed for Pyramid in the October 25 proposal, with installments due on or after September 22, 2005. *See Wilson*, 168 S.W.3d at 823, 827.

## B. The evidence is legally sufficient to support that Pyramid missed installment payments.

We already have concluded that more than a scintilla of competent evidence supports the existence of an installment contract between Wood and Pyramid, with installments due on or after September 22, 2005, covering the October 25 proposal. Now we consider whether there was legally sufficient evidence to support a breach by Pyramid to pay any installments due on or after September 22, 2005, as the jury found in question 3.

---

[7] Based on simple calculations of what was allegedly still owed and accounting for payments already made by Pyramid, the payment plan as Pyramid itself described in both the April and July 2005 letters could not only have been toward the payment of Phases 1 and 3.

In its motion for JNOV, Pyramid further argued, even if there was evidence of modification of the October 25 proposal's payment terms into an installment contract, there was no evidence to support that Pyramid missed paying any installments after September 22, 2005. Pyramid emphasizes that it made all the payments referenced in its July 2005 letter and Wood did not complain that the balance on the October 25 proposal had not been paid until after Pyramid made its "final" payment.

On appeal, Wood argues he contacted Anderson shortly after he did not receive any additional monthly checks from Pyramid and informed her that Pyramid still owed him more money, in the approximate amount of $202,000, but she told him that Pyramid already had "paid [him] for the return air system" and refused to pay him anything else.

A breach of contract occurs when a party refuses to do something he has promised to do. *Townewest Homeowners Ass'n, Inc. v. Warner Commc'n Inc.*, 826 S.W.2d 638, 640 (Tex. App.—Houston [14th Dist.] 1992, no pet.). An installment contract is breached every time a payment is missed. *See Crown Asset Mgmt., LLC v. Carter*, No. 07-08-0164-CV, 2009 WL 578633, at *2 (Tex. App.—Amarillo Mar. 6, 2009, no pet.) (mem. op.); *Hollander v. Capon*, 853 S.W.2d 723, 726 (Tex. App.—Houston [1st Dist.] 1993, writ denied). Although many installment contract cases involve fixed payments,[8] any failure to make payments "calculated and paid on a periodic basis" may constitute a breach. *See Spin Doctor Golf, Inc. v. Paymentech, L.P.*, 296 S.W.3d 354, 362–63 (Tex. App.—Dallas 2009, pet. denied) (installment contract called for periodic, varying payments based on credit card sales); *see also Peters v. Bentwater Yacht & Country Club, Ltd.*, No. 4:12-cv-3596,

---

[8] *See, e.g., Gardner v. Cummings*, No. 14-04-01074-CV, 2006 WL 2403299, at *3 (Tex. App.—Houston [14th Dist.] Aug. 22, 2006, pet. denied) (mem. op.) (installment contract called for periodic, fixed payments of past-due rent and future rent).

15

2013 WL 2422657, at \*5 (S.D. Tex. June 3, 2013) ("A fixed quantity or price is not necessary to have an enforceable installment contract." (discussing *Spin Doctor Golf*)). Insofar as a dispute exists concerning the failure of a party to perform the contract, courts submit disputed fact questions to the jury. *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 632 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Both Wood and Anderson testified that Pyramid was submitting payments "on a monthly basis." Indeed, the record reflects that Pyramid paid Wood 23 payments toward their installment contract, in varying amounts "on a periodic basis" beginning in November 2004, and that, as previously analyzed, the evidence is legally sufficient to support that the contract covered payment of the October 25 proposal. Pyramid's last installment payment occurred in October 2005. At the time of the last installment, there is evidence that Pyramid owed Wood at least $202,000 in outstanding payments on the October 25 proposal. Once Wood realized that he was not going to receive another monthly payment for November 2005, he approached Anderson to demand payment of $202,000—the amount outstanding on the October 25 proposal. Pyramid refused to pay Wood any more periodic installments.

In light of the evidence that Pyramid intended to pay Wood for all his services rendered, including the October 25 proposal, and indulging every reasonable inference to support the challenged finding, a reasonable and fair-minded jury could infer the "final" nature of the October 2005 check payment referred to the fact that it apparently "finally" paid off Phase 1, particularly Invoice 1154, the first installation of the "return air system on 2 buildings." The October 2005 payment was notably silent about being any "final" payment for the second installation of the return air system as performed under the October 25 proposal

16

after the Power Center collapsed or for any services performed but not ultimately covered by insurance.[9] Moreover, we conclude a jury reasonably could infer that Wood did not "spring a claim" on Pyramid where the installment contract between the parties included varying amounts of payment on a periodic basis; where several of the installment checks did not strictly correlate to any particular "sub" payoff agreement; where Wood submitted four invoices from August 30 to October 7, 2004, totaling $202,400.80, submitted a separate October 25 proposal for $220,000.00, and performed an $18,000.00 Village of Hope job; where Pyramid submitted a $220,000.00 loss claim directly based on the October 25 proposal; and where Pyramid had in fact issued payments toward the October 25 proposal.

Based on our review of the evidence in the light most favorable to this finding, we conclude the evidence at least raised a fact issue that Pyramid failed to pay additional installment payments on the October 25 proposal still due to Wood on or after September 22, 2005. *See Wilson*, 168 S.W.3d at 823, 827. To the extent that Pyramid also challenged the amount of damages awarded by the jury in question 4,[10] we similarly conclude that some evidence exists to support a reasonable and fair-minded jury's award of $202,000.00 in contract damages due on or after September 22, 2005. *See id.*

---

[9] The only written demand in the record was a letter from Wood's initial attorney dated January 18, 2005, indicating the outstanding balance at that time was $196,000.00, which is consistent with the fact that the $220,000.00 insurance claim on the October 25 proposal was still pending.

[10] Question 4 asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Wood] for his damages, if any, that resulted from such failure to pay installments which were due on or after September 22, 2005 for the materials and services referred to in [the October 25 proposal]?"

17

**C. The evidence does not conclusively establish Pyramid's limitations defense as a ground for JNOV.**

The trial court here did not specify its basis or bases for granting JNOV. Having considered the language of Pyramid's motion for JNOV, we are not convinced that it expressly presented the conclusive establishment of its affirmative defense of limitations as a ground for JNOV. In his brief, however, Wood addresses limitations, asserting Pyramid did not prove this defense at trial. Wood contends the only defense reflected in Anderson's trial testimony was that Wood had been paid in full, not that his claims should be barred by limitations. In its brief, Pyramid argues the record contains evidence to support that Wood's contract claim accrued on April 19, 2005, when the carrier finally denied Pyramid's claim, or by the latest July 15, 2005, when Pyramid began payment toward the "payoff agreement."[11] Pyramid challenged the jury's findings in its JNOV motion; questions 2 through 4 all included the September 22, 2005, date with regard to limitations; and by answering those questions in the affirmative the jury implicitly rejected Pyramid's limitations defense. In addition, Pyramid moved for a directed verdict with regard to limitations. *See* Tex. R. Civ. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991) ("A court may render judgment n.o.v. if a directed verdict would have been proper."). Therefore, where Pyramid also argues limitations by cross-point, we consider whether it is a permissible basis for affirming the trial court's JNOV. *See Sbrusch*, 818 S.W.2d at 394.

---

[11] Within its brief, Pyramid also argues the trial court did not abuse its discretion by granting the directed verdict setting the limitations date of September 22, 2005. Although Wood objected during the charge conference, we find nothing within Wood's brief that explicitly or implicitly challenges the inclusion of the four-year limitations date within questions 2 through 4. Rather, Wood's primary contention is that the trial court erred in disregarding the jury's breach of contract findings.

18

When a movant for JNOV challenges an adverse finding on an affirmative defense, it must conclusively establish all vital facts in support of that defense. *Mosqueda v. G & H Diversified Mfg., Inc.*, 223 S.W.3d 571, 576 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Therefore, to show its entitlement to judgment as a matter of law, Pyramid had to conclusively establish that Wood's contract claim was not viable because it was barred by limitations. *See id.*; *see also Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988); (defendant bears burden to plead and prove affirmative defense of statute of limitations).

A four-year statute of limitations generally applies to contract disputes. Tex. Civ. Prac. & Rem. Code §§ 16.004(a)(3) (debt), 16.051 (residual limitations) (West 2011). A breach of contract claim accrues on the date the contract is breached or when the claimant has notice of facts sufficient to place him on notice of the breach. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002) (per curiam); *Crown Asset Mgmt.*, 2009 WL 578633, at \*2. In other words, the cause accrues when facts come into existence that authorize a claimant to seek a judicial remedy. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). When an installment agreement call for periodic payments during the course of the contract, a cause of action for nonpayment accrues for each missed payment. *See Crown Asset Mgmt.*, 2009 WL 578633, at \*2; *Gardner v. Cummings*, No. 14-04-01074-CV, 2006 WL 2403299, at \*2 (Tex. App.—Houston [14th Dist.] Aug. 22, 2006, pet. denied); *Hoarel Sign Co. v. Dominion Equity Corp.*, 910 S.W.2d 140, 144 (Tex. App.—Amarillo 1995, writ denied); *Townewest Homeowners*, 826 S.W.2d at 640; *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The defendant must prove when a cause of action accrued to establish that the statute of limitations is applicable as a

19

bar to the plaintiff's case. *Intermedics*, 683 S.W.2d at 845.

Here, Wood's suit to recover on Pyramid's debt was filed on September 21, 2009. We already have determined fact issues exist as to the existence of an installment contract that covered the October 25 proposal and extended past September 22, 2005, and as to Pyramid's failure to pay any installments past such date. In other words, some evidence exists that Pyramid made its last payment on the installment contract in October 2005, when there were still additional periodic payments due to Wood on the October 25 proposal. Moreover, Pyramid has not pointed us to any evidence sufficient to establish as a matter of law that Wood's cause of action commenced on April 19, 2005, or July 15, 2005, or any other date outside the statute of limitations.[12] As a result, Pyramid has not satisfied its burden to conclusively establish that Wood's cause of action accrued outside the statute of limitations. Because Pyramid has the burden of proof on this affirmative defense, and because it failed to prove it was entitled to it as a matter of law, we conclude that we cannot sustain JNOV on this ground. *See Sbrusch*, 818 S.W.2d at 394.

We cannot conclude that there is a complete absence or no more than a scintilla of evidence supporting the existence of an installment contract and of Pyramid's breach, or that the evidence conclusively establishes that no installment contract existed and Pyramid did not breach it. *See Ramirez*, 159 S.W.3d at 903. We also cannot conclude that Pyramid has conclusively proven its affirmative defense of limitations. *See Mosqueda*, 223 S.W.3d at 576.

Therefore, we sustain Wood's issue and must reverse the trial court's JNOV unless Pyramid otherwise presents a successful cross-point to merit a new trial.

---

[12] On summary judgment, Pyramid previously had argued that the accrual date was January 5, 2005, when the carrier initially denied Pyramid's claim. *See Wood*, 2012 WL 2394053, at *4. At trial, Pyramid argued that the accrual date was October 27, 2004, when Wood completed work on the October 25 proposal.

*See* Tex. R. Civ. P. 324(c); *Burns*, 880 S.W.2d at 151.

## D. The evidence is factually sufficient to support Pyramid's breach of its installment contract with Wood within the limitations period.

In our review of the trial court's granting of JNOV here, the core questions are whether the evidence in the record supports the parties entered an installment contract that covered the October 25 proposal and extended past September 22, 2005, and whether the evidence supports that Pyramid failed to pay any periodic payment installments. We have already conducted our legal sufficiency review and concluded it does. In one sentence, Pyramid simply reurges the no evidence portion of its brief.

Although there certainly were two conflicting versions of events put forth, Pyramid has not demonstrated that the evidence is factually insufficient to support the jury's affirmative findings. After examining the entire record, considering both the evidence in favor of, and contrary to, the challenged findings, and considering and weighing all the evidence, we conclude that the jury's findings that Wood and Pyramid agreed that Pyramid would pay Wood for the October 25 proposal in installments due on or after September 22, 2005, and that Pyramid failed to pay any such installments, was not so contrary to the weight of the evidence as to be clearly wrong and manifestly unjust. *See Jackson*, 116 S.W.3d at 761–62.

Also within its cross-point, Pyramid singularly asserts that the statute of limitations vitiates the jury's verdict. However, we already have concluded that the trial court's JNOV cannot be sustained on limitations grounds.

We overrule Pyramid's cross-point.

## IV.    CONCLUSION

Therefore, we reverse the trial court's order granting JNOV, and render judgment reinstating the jury's verdict for damages in the amount of $202,000.00 and attorney's fees in the amount of $16,178.75.  We remand solely for the trial court to calculate and award pre- and post-judgment interest as allowed by law.


/s/    Marc W. Brown
Justice



Panel consists of Justices McCally, Brown, and Wise.